STATE OF NORTH CAROLINA v. FREDRICK CAMACHO

No. 14A92

(Filed 29 July 1994)

**1. Homicide § 550 (NCI4th)— first-degree murder—conflict about underlying felony or lying in wait—submission of lesser offenses**

For all murder cases prosecuted under N.C.G.S. § 14-17 (1993), when there is a conflict in the evidence regarding whether defendant committed the underlying felony or was lying in wait,

all lesser degrees of homicide charged in the indictment pursuant to N.C.G.S. § 15-144 and supported by the evidence must be submitted to the jury.

**Am Jur 2d, Homicide §§ 525 et seq.**

**Lesser-related state offense instructions: modern status. 50 ALR4th 1081.**

2. **Homicide § 557 (NCI4th)— first-degree murder—conflicting evidence as to lying in wait—submission of lesser offenses**

There was a conflict in the evidence as to whether defendant committed a murder by lying in wait where the State's evidence tended to show that defendant hid in the victim's closet and waited for her to return to her room before jumping out of the closet and assaulting her with a hammer, but defendant testified that he was in the victim's room only to retrieve some personal belongings when he was overcome with "head rushes" resulting from his excessive use of alcohol and cocaine, that he was trying to pick up some tools he had dropped when the victim entered the room and initiated a struggle by attacking him with a knife, and that during the struggle he struck her with a hammer, causing her death. Because of this conflict in the evidence, the trial judge should have given the jury an instruction upon any version of the crime supported by the evidence favorable to defendant, *i.e.*, any version of the crime which did not involve lying in wait, and which was supported by other evidence and charged in the indictment.

**Am Jur 2d, Homicide §§ 525 et seq.**

**Lesser-related state offense instructions: modern status. 50 ALR4th 1081.**

3. **Homicide § 557 (NCI4th)— first-degree murder—conflict as to lying in wait—submission of second-degree murder required by evidence**

In a prosecution for first-degree murder wherein the evidence was conflicting as to whether defendant committed the offense by lying in wait, the trial court should have submitted the lesser included offense of second-degree murder to the jury where defendant's evidence tended to show that after the victim assaulted him with a knife, he intentionally beat her with a hammer,

causing her death, and defendant testified that he did not intend to kill the victim but he did intend to beat the victim in the head with the hammer, since the jury could reasonably infer from this evidence that the killing was with malice but not with premeditation and deliberation.

**Am Jur 2d, Homicide §§ 525 et seq.**

**Lesser-related state offense instructions: modern status. 50 ALR4th 1081.**

4.  **Homicide § 562 (NCI4th)— first-degree murder—conflict as to lying in wait—provocation by victim—submission of voluntary manslaughter required by evidence**

    In a prosecution for first-degree murder wherein the evidence was conflicting as to whether defendant committed the offense by lying in wait, the trial court should have submitted the lesser included offense of voluntary manslaughter to the jury where defendant's evidence tended to show that defendant, whose mind was already clouded from cocaine and alcohol use, became enraged after seeing the victim with another man and after being attacked by the victim with a knife, and that he struck the victim with a hammer, causing her death, since the jury could find legal provocation by the victim.

    **Am Jur 2d, Homicide §§ 525 et seq.**

    **Lesser-related state offense instructions: modern status. 50 ALR4th 1081.**

5.  **Criminal Law § 803 (NCI4th); Homicide § 550 (NCI4th)— necessity for instructions on lesser included offenses—due process—N.C. law**

    The Due Process Clause of the Fourteenth Amendment and North Carolina law require that all lesser included offenses charged in the bill of indictment and supported by the evidence be submitted to the jury. The trial court's erroneous failure in a first-degree murder prosecution to submit the lesser offenses of second-degree murder and voluntary manslaughter, being of constitutional dimension, entitled defendant to a new trial where it could not be concluded beyond a reasonable doubt that the verdict would have been the same if the lesser offenses had been submitted. N.C.G.S. §§ 15-17, 15-172.

    **Am Jur 2d, Trial §§ 876 et seq.**

**STATE v. CAMACHO**

[337 N.C. 224 (1994)]

**Lesser-related state offense instructions: modern status. 50 ALR4th 1081.**

Justice MITCHELL concurring.

Appeal pursuant to N.C.G.S. § 7A-27(a) (1989) from a judgment imposing a sentence of death entered by Kirby, J., at the 11 November 1991 Criminal Session of Superior Court, Mecklenburg County, upon a jury verdict of guilty of first-degree murder and recommendation of the death penalty. Heard in the Supreme Court 10 May 1994.

*Michael F. Easley, Attorney General, by G. Patrick Murphy, Special Deputy Attorney General, for the State.*

*Kenneth J. Rose for defendant-appellant.*

EXUM, Chief Justice.

Defendant was tried on a true bill of indictment pursuant to N.C.G.S. § 15-144 (1983) charging that defendant "did unlawfully, wilfully, and feloniously and of malice aforethought kill and murder Rhonda Leonard Price." The case was prosecuted as a first-degree murder on the theory that the murder of Rhonda Leonard Price was perpetrated by means of lying in wait in violation of N.C.G.S. § 14-17 (1993). The jury was instructed to find the defendant guilty or not guilty of first-degree murder by lying in wait but received no instruction concerning any lesser degrees of homicide. Following the guilt-innocence phase of trial the jury returned a verdict of guilty of first-degree murder. At a separate sentencing proceeding, the jury recommended, and the trial court imposed, a sentence of death.

Defendant has submitted forty-three assignments of error, but, because we find error necessitating a new trial in the second assignment, we need not discuss the others. The question presented in the second assignment of error is whether the trial court erred in failing to submit to the jury second-degree murder and voluntary manslaughter as lesser degrees of homicide charged in the indictment and supported by the evidence. We conclude this was error entitling defendant to a new trial.

I.

The State presented evidence at trial which tended to show as follows:

**STATE v. CAMACHO**

[337 N.C. 224 (1994)]

Defendant Fredrick Camacho and the victim, Rhonda Leonard Price, also referred to as Sue Price, began dating after defendant's honorable discharge from the Marine Corps. They met in Lexington, North Carolina, approximately 18 months before her death; eventually they both relocated to Charlotte. Their relationship consisted of a series of break-ups and attempts at reconciliation.

On 24 February 1986 defendant broke into Room 524 at the Uptown Motor Inn in Charlotte, a room then occupied by the victim, and assaulted the victim with a hammer. As a result, the victim obtained warrants charging defendant with assault on a female and damage to personal property. On 1 March 1986, defendant was informed by his landlord that the police had been by the house with a warrant for his arrest. The landlord told defendant to go downtown and straighten everything out with the police before returning home.

According to a written statement given by defendant after his arrest, he next went to the victim's room at the Downtown Motor Inn where the victim was then living, pried the door open with a screwdriver, sat in the closet, and started thinking about "Sue's" treatment of him. When the victim returned to her room, the defendant "jumped out of the closet" and started hitting her in the head with a hammer "until [he] got exhausted." Dr. John D. Butts, a forensic pathologist, testified that the victim died from blunt force trauma to the head.

At approximately 12:08 a.m. on 2 March 1986, investigators E.L. Kirchen and J.V. Lombardo were called to the victim's room. When the investigators entered the room, they saw defendant standing with a hammer in one hand and his tool belt in the other. When they ordered Camacho to drop the hammer, he did so and stated, "I killed her." When Kirchen remarked, "I don't see how anyone could do something like this," defendant responded, "She deserved it."

Officer Lombardo testified that defendant told him during the processing of his arrest that his "landlord said the cops came out to my house looking for me." Defendant said he "was going to get [Sue] back because I know she sent them looking for me." Defendant told this investigator that he was hiding in the closet on the night of the murder prior to the victim entering her room. Later that morning, after going over his Miranda rights form with another investigator, defendant stated: "I told the bitch. I told her. She got what she deserved."

The defendant presented evidence at trial which tended to show as follows:

**STATE v. CAMACHO**

[337 N.C. 224 (1994)]

Defendant testified that a major source of his problems with the victim was their substance abuse. The victim took tranquilizers, and defendant had used drugs since he was 13 and had also had continuing problems with alcohol abuse. In early February of 1986 defendant admitted himself to Charter Pines Hospital because of his addiction to cocaine and alcohol. He had to leave the four-week program around 21 February because he lacked the funds to remain there. On 24 February, he spoke to the victim and went by her hotel room to talk with her. They had an argument and fought. He shoved her against a wall and broke a window.

The night before the murder, defendant said he had been drinking heavily and therefore did not go to work the next morning. The day of the murder, defendant caught a ride downtown to do some side work. Instead of doing the work, he snorted six "lines" of cocaine and drank heavily for two hours. He then went to the victim's hotel room to retrieve some property she was holding for him. He popped the door open, walked in, and began collecting his property, but he soon decided against this and left.

When defendant later returned to the victim's room, he knocked on the door but got no answer. He entered the room and began having some "super, super heavy rushes, head rushes" from the cocaine and alcohol. While in this mental state, he noticed some of his clothes in the closet and stood up to go over and retrieve them. As he stood, he had a rush and fell to his knees, dropping his tools and reaching out and grabbing the curtain covering the closet.

He was halfway in and out of the closet and was picking up his tools when the victim and her friend Ronnie Seymour entered the room. Defendant stood up and Seymour ran out of the room. The victim looked at defendant and yelled, "Oh my God, it's not what you think." Defendant responded, "I'm not that stupid." The victim then grabbed his hair and attacked him with a knife. He felt his head being struck and jerked downward. They began to fight, and he went blank and began to strike her with his hammer. He did not recall hitting her more than once before he went "off the deep end." He did not recall cutting her with the knife, nor did he remember telling any of the investigators that "she deserved it."

The defendant further testified that he never denied killing the victim. He admitted being there and admitted being responsible for her death. He said he felt sad and remorseful for the killing and that

she did not deserve what happened to her. He said he loved her and that her rejection hurt him.

Defense witness Officer Lombardo heard defendant say that he "didn't mean to hit her so many times," and that he "couldn't stop hitting her." After being shown his previous testimony, Officer Lombardo stated that defendant said at the scene of the crime that he "didn't mean to hit her [at all]."

## II.

In his second assignment of error, defendant contends the trial court erred in failing to charge the jury on second-degree murder and voluntary manslaughter as lesser degrees of homicide charged in the indictment and supported by the evidence. Defendant maintains the evidence as to whether he committed the homicide by lying in wait is in conflict; therefore the trial court's failure to instruct the jury on lesser degrees of homicide is error entitling him to a new trial. We agree.

In *State v. Gause*, 227 N.C. 26, 40 S.E.2d 463 (1946), we decided the trial court erred by not submitting a verdict of second-degree murder to the jury where the evidence on whether defendant was lying in wait was in conflict. We held that when "more than one inference may be drawn from the evidence in respect to lying in wait, it is error for the trial court to fail to charge the jury that a verdict of murder in the second degree may be returned." *Id.* at 30, 40 S.E.2d at 466.

In *State v. Thomas*, 325 N.C. 583, 386 S.E.2d 555 (1989), the State prosecuted defendant solely on a felony-murder theory, contending that the defendant acted in concert with another in the commission of the underlying felony of discharging a firearm into an occupied structure during the course of which the homicide occurred. There was, however, conflicting evidence on whether defendant committed the underlying felony. The indictment was drafted pursuant to N.C.G.S. § 15-144 (1983).

After noting our decisions that an indictment drafted pursuant to N.C.G.S. § 15-144 was effective to charge first-degree murder and all lesser degrees of homicide, we held in *Thomas* that where the evidence was in conflict regarding whether defendant committed the underlying felony, the lesser offense of involuntary manslaughter should have been submitted because absent defendant's commission of the underlying felony the evidence supported a verdict of guilty of involuntary manslaughter. *Thomas*, 325 N.C. at 599, 386 S.E.2d at 564.

We stated, "in a felony murder prosecution under an indictment in the form prescribed by N.C.G.S. § 15-144 evidence that defendant did not commit the underlying felony requires an instruction upon whatever lesser included homicides the indictment and the evidence support." *Id.* at 592, 386 S.E.2d at 560 (citing *State v. Williams*, 284 N.C. 67, 199 S.E.2d 409 (1973)).

In *State v. Leroux*, 326 N.C. 368, 390 S.E.2d 314, *cert. denied*, 498 U.S. 871, 112 L. Ed. 2d 155 (1990), the evidence showed that defendant, under cover of darkness, made a secret assault upon an officer who defendant knew had come to apprehend him. Referring to both *Gause* and *Thomas*, we stated "when the evidence permits more than one inference with respect to lying in wait, the trial court must instruct the jury on second-degree murder." *Id.* at 378, 390 S.E.2d at 322. Because, however, there was no conflict in the evidence suggesting that defendant committed the crime by means other than lying in wait, we concluded there was no error in not submitting any lesser degrees of homicide to the jury. *Id.* at 379, 390 S.E.2d at 322.

[1] Thus it is clear that for all murder cases prosecuted under N.C.G.S. § 14-17 (1993), when there is a conflict in the evidence regarding whether defendant committed the underlying felony or was lying in wait, all lesser degrees of homicide charged in the indictment pursuant to N.C.G.S. § 15-144 and supported by the evidence must be submitted to the jury.

A.

[2] Here the evidence is in conflict as to whether the crime was committed by lying in wait. The State's evidence tends to show that it was, but the defendant's evidence tends to show that it was not.

Homicide by lying in wait is committed when: the defendant lies in wait for the victim, that is, waits and watches for the victim in ambush for a private attack on him, *State v. Gause*, 227 N.C. 26, 40 S.E.2d 463 (1946), intentionally assaults the victim, *State v. Willis*, 332 N.C. 151, 420 S.E.2d 158 (1992), proximately causing the victim's death, *State v. Brown*, 320 N.C. 179, 358 S.E.2d 1, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987). *See* N.C.P.I.—Crim. 206.16 (1987).

In *Brown*, the defendant announced his intention to kill the victim, walked alone to the window next to the victim's office, waited for the victim to bend down, and then shot him to death. We decided "even a moment's deliberate pause before killing one unaware of the impending assault and consequently 'without opportunity to defend

himself' satisfies the definition of murder perpetrated by lying in wait." *Brown,* 320 N.C. at 190, 358 S.E.2d at 10 (quoting *State v. Wiseman,* 178 N.C. 784, 790, 101 S.E. 629, 631 (1919)). *See also State v. Allison,* 298 N.C. 135, 257 S.E.2d 417 (1979). In *Allison,* we stated:

> [I]t is not necessary that [the assailant] be actually concealed in order to lie in wait. If one places himself in a position to make a private attack upon his victim and assails him at a time when the victim does not know of the assassin's presence or, if he does know, is not aware of his purpose to kill him, the killing would constitute a murder perpetrated by lying in wait. . . . The fact that he reveals himself or the victim discovers his presence will not prevent the murder from being perpetrated by lying in wait.

*Id.* at 148, 257 S.E.2d at 425.

Here, the State's evidence tends to show that the defendant hid in the victim's closet and waited for her to return to her room before jumping out of the closet and assaulting her with a hammer, leading to her death. This evidence clearly supports submission of murder by lying in wait to the jury.

Defendant's evidence, however, tends to show he did not lie in wait for his victim. Defendant testified that he was in the victim's room only to retrieve some personal belongings when he was overcome with "head rushes" resulting from his excessive use of alcohol and cocaine. He testified he was trying to pick up some tools he had dropped when the victim entered the room and then initiated the struggle by attacking him with a knife. During the ensuing struggle he struck her with a hammer, causing her death.

### B.

Because of this conflict in the evidence regarding whether defendant lay in wait, the trial judge should have given the jury an instruction based upon any version of the crime supported by the evidence favorable to defendant, i.e., any version of the crime which did not involve lying in wait, and which is supported by other evidence and charged in the indictment. *Leroux,* 326 N.C. 368, 390 S.E.2d 314; *Thomas,* 325 N.C. 583, 386 S.E.2d 555. An indictment for homicide under N.C.G.S. § 15-144 charges not only murder in the first degree but all lesser degrees of homicide, i.e., murder in the second degree, voluntary manslaughter, and involuntary manslaughter. *Leroux,* 326 N.C. 368, 390 S.E.2d 314; *Thomas,* 325 N.C. 583, 386 S.E.2d 555. Thus, the question becomes which of these crimes is supported by evidence

other than the evidence of lying in wait. We believe this evidence supports submission to the jury of second-degree murder and voluntary manslaughter.

Second-degree murder is defined as "the unlawful killing of a human being with malice but without premeditation and deliberation." *State v. Fleming*, 296 N.C. 559, 562, 251 S.E.2d 430, 432 (1979) (quoting *State v. Foust*, 258 N.C. 453, 458, 128 S.E.2d 889, 892 (1963)). A specific intent to kill is not a necessary element of second-degree murder, and malice may be inferred from the intentional use of a deadly weapon. *State v. Lang*, 309 N.C. 512, 308 S.E.2d 317 (1983); *State v. Wilkerson*, 295 N.C. 559, 247 S.E.2d 905 (1978).

[3] Defendant's evidence shows that after the victim assaulted him with a knife, he intentionally beat her with a hammer, causing her death. Defendant testified that he did not intend to kill the victim but he did intend to beat the victim in the head with a hammer. The hammer, as used, easily qualifies as a deadly weapon. From this evidence the jury could reasonably infer that the killing was with malice, but not with premeditation and deliberation. This evidence could, therefore, support a verdict of guilty of second-degree murder.

Voluntary manslaughter is defined as "the unlawful killing of a human being without malice and without premeditation and deliberation." *Fleming*, 296 N.C. at 562, 251 S.E.2d at 432 (quoting *State v. Benge*, 272 N.C. 261, 263, 158 S.E.2d 70, 72 (1967)). Voluntary manslaughter often occurs when the defendant acts in a heat of passion produced by legal provocation. *See generally State v. Wynn*, 278 N.C. 513, 180 S.E.2d 135 (1971); *State v. Cooper*, 273 N.C. 51, 159 S.E.2d 305 (1968). Legal provocation exists when the victim's actions against the defendant rise to the level of an assault or threatened assault. *State v. Rogers*, 323 N.C. 658, 374 S.E.2d 852 (1989); *State v. Montague*, 298 N.C. 752, 259 S.E.2d 899 (1979). The doctrine of heat of passion is "meant to reduce murder to manslaughter when defendant kills without premeditation and without malice, but rather under the influence of the heat of passion suddenly aroused which renders the mind temporarily incapable of cool reflection." *State v. Forrest*, 321 N.C. 186, 193, 362 S.E.2d 252, 256 (1987) (citing *State v. Jones*, 299 N.C. 103, 261 S.E.2d 1 (1980)).

[4] Here, defendant's evidence tends to show that defendant, whose mind was already clouded from cocaine and alcohol use, became enraged after seeing the victim with another man and after being attacked by the victim with a knife. Such an attack suffices as legal

provocation. *See State v. McConnaughey*, 66 N.C. App. 92, 311 S.E.2d 26 (1984) (victim's charging at and wrestling with defendant was sufficient legal provocation to instruct the jury on voluntary manslaughter). This evidence could, therefore, support a verdict of voluntary manslaughter.

### III.

[5]   We are also persuaded by defendant's argument that the Due Process Clause of the Fourteenth Amendment and North Carolina law require that all lesser included offenses charged in the bill of indictment and supported by the evidence be submitted. *See* N.C.G.S. § 15-170 (1983) ("upon the trial of any indictment the prisoner may be convicted of the crime charged therein or of a less degree of the same crime"); N.C.G.S. § 15-172 (1983) ("the jury before whom the offender is tried shall determine in their verdict whether the crime is murder in the first or second degree"); *Beck v. Alabama*, 447 U.S. 625, 65 L. Ed. 2d 392 (1980). Such a requirement "aids the prosecution when its proof may not be persuasive on some element of the greater offense, and it is beneficial to the defendant 'because it affords the jury a less drastic alternative than the choice between conviction of the offense charged and acquittal.' " *Thomas*, 325 N.C. at 599, 386 S.E.2d at 564 (quoting *Beck*, 447 U.S. at 633, 65 L. Ed. 2d at 400). This requirement also alleviates concern that

> [i]n a case in which "one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of *some* offense, the jury is likely to resolve its doubts in favor of conviction" despite the existing doubt, because "the jury was presented with only two options: convicting the defendant . . . or acquitting him outright."

*Id.* at 599, 386 S.E.2d at 564 (quoting *Keeble v. United States*, 412 U.S. 205, 212-13, 36 L. Ed. 2d 844, 850 (1973)) (emphasis in original).

In the instant case, while the evidence is in conflict regarding whether defendant was lying in wait before he killed the victim, all the evidence points to criminal culpability on defendant's part. Therefore, the jury should have been permitted to consider whether defendant was guilty of the lesser degrees of homicide of second-degree murder and voluntary manslaughter. The jury should not have been required to choose only between guilty as charged or not guilty.

We conclude, for the reasons given, that the trial court's failure to instruct the jury on the lesser degrees of homicide of second-degree

murder and voluntary manslaughter is error. This error, being of constitutional dimension, *Beck*, 417 U.S. 625, 65 L. Ed. 2d 392, entitles defendant to a new trial unless we can conclude beyond a reasonable doubt, based on the State's case, that the verdict would have been the same even if the lesser offenses had been submitted. N.C.G.S. § 15A-1443(b) (1988); *see State v. Silva*, 304 N.C. 122, 282 S.E.2d 449 (1981) (when error is of constitutional dimension, prejudice is presumed and burden is on State to prove otherwise). On the state of the evidence before us, we cannot make this conclusion.

The verdict and judgment below are, therefore, vacated and defendant is given a

NEW TRIAL.

Justice MITCHELL concurring.

The result reached by the majority here is consistent with this Court's decision in *State v. Thomas*, 325 N.C. 583, 386 S.E.2d 555 (1989). I dissented from the decision of the majority in *Thomas*, and I continue to believe that the reasoning of my dissent in that case was correct. *Id.* at 600-606, 386 S.E.2d at 564-68 (Mitchell, J., dissenting, joined by Webb, J.). However, the doctrine of *stare decisis*—which commands that courts abide by established binding precedent except in the most extraordinary circumstances—requires that I now accept *Thomas* as authoritative and concur in the decision of the majority in the present case.